**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James D. SMITH, Defendant-Appellant.**

**No. 83–1004.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 15, 1983.

Decided Aug. 16, 1983.

Geoffrey A. Hansen, Asst. Federal Public Defender, San Francisco, Cal., for defendant-appellant.

Eb F. Luckel, Jr., Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before GOODWIN and HUG, Circuit Judges, and SOLOMON,* District Judge.

HUG, Circuit Judge:

Smith was convicted of one count of possession of burglary tools in violation of the Assimilated Crimes Act, 18 U.S.C. § 13, and one count of·giving false information to a federal officer in violation of 36 C.F.R. § 2.10. On appeal, he argues that certain evidence obtained subsequent to a *Terry* stop should have been suppressed because the stop was actually an arrest without probable cause or, alternatively, because the United States Park Police officers had no authority to make the *Terry* stop off federal property. We hold that the stop was not

an arrest and the officers did have authority to make the *Terry* stop under 16 U.S.C. § 1a–6(a)(3). We therefore affirm the convictions.

## I

The incidents leading to Smith's arrest took place in and around Fort Mason. Fort Mason, which is located in San Francisco, California, is part of a national recreation area controlled by the United States Department of Interior. Law enforcement at Fort Mason is generally handled by the United States Park Police.

A park police officer at Fort Mason first observed Smith walking between some cars in a parking lot which had been the site of several recent automobile burglaries. Smith apparently noticed the officer because he quickly reversed his direction and ducked out of sight. Shortly thereafter, another officer observed Smith crouching between two cars with a metal pipe in one hand and the other hand on a car door. As the officer approached, Smith left the parking lot and moved a few yards off federal property to a city sidewalk directly adjacent to Fort Mason, and commenced hitting a fire hydrant with the metal pipe.

At this point, while Smith was still a few yards off federal property, the two officers who had first observed Smith in the Fort Mason parking lot approached him and identified themselves. They told Smith to drop the pipe and briefly frisked his outer waist area. Smith was then asked his name. He responded with a false name and stated that he had no identification. He was asked why he was in the area, and replied that he was going to see the museum. There was no museum nearby. Smith was then asked why he had ducked between cars when he saw the park police. Instead of answering, Smith ran away and the police gave chase. The length of the detention up to this point was between 40 and 90 seconds.

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

As Smith fled, a one-foot-long screwdriver dropped from his clothing. He was apprehended and arrested within two minutes.

Smith was charged under the Assimilated Crimes Act, 18 U.S.C. § 13, with possession of burglary tools in violation of California Penal Code Section 466. He was also charged with giving false information to a federal officer in violation of 36 C.F.R. § 2.10. Smith consented to be tried before a magistrate. The magistrate denied Smith's motion to suppress the screwdriver and metal pipe, and found him guilty of both counts. The district court affirmed the convictions and this appeal followed.

## II

The park police officers' authority to act is contained in 16 U.S.C. § 1a–6(a). Section 1a–6(a)(1) authorizes park police officers, under certain circumstances, to make arrests within the National Park System, or outside of that system if the arrestee is fleeing from park property to avoid arrest. Section 1a–6(a)(2) concerns the authority of park police officers to execute warrants. Under section 1a–6(a)(3), the park police may investigate offenses committed in the park system in the absence of an investigation by another federal law enforcement agency or in cooperation with another agency.

In this case, the park police officers may well have been without authority to make the arrest of Smith off federal property. That, however, is not in issue. It is the failure to suppress the pipe and screwdriver that Smith challenges. These items were not seized as a result of the arrest. Their seizure resulted from the initial stop of Smith by the fire hydrant. The pipe was seized during the initial stop, and the screwdriver was dropped by Smith as he fled prior to his ultimate arrest.

The primary issue, therefore, is the legality of the initial stop of Smith. Smith contends that this stop was in fact an arrest for which there was not probable cause. He further contends that the park police officers had no authority under section 1a–6(a) to make the stop off federal property. The Government argues that the initial stop was an investigative stop, not an arrest, and that such a stop is authorized by section 1a–6(a)(3). The Government has expressly disavowed reliance on section 1a–6(a)(1), and section 1a–6(a)(2) is clearly inapplicable.

## III

The magistrate, in a ruling affirmed by the district court, held that the initial stop of Smith by the fire hydrant was not an arrest, but rather was an investigative stop controlled by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Smith contends that this was an arrest, and that it was without probable cause and beyond the jurisdiction of the park police. Smith concedes, as he must, that there were sufficient grounds for a *Terry* stop, and the Government concedes that there was no probable cause for an arrest. The first question, therefore, is whether the initial detention of Smith was a *Terry* stop or an arrest. If it were an arrest, the items subsequently seized should have been suppressed due to the lack of probable cause.

The Supreme Court in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), carefully analyzed the distinction between an arrest and the type of investigative stop permitted under *Terry.* It is clear that under *Dunaway* reasonable suspicion is sufficient to justify a brief stop for a few brief questions. *Id.* at 210–11, 99 S.Ct. at 2255–56; *United States v. Chamberlin,* 644 F.2d 1262, 1266 (9th Cir.1980), *cert. denied,* 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). That is exactly what occurred in this case. Smith argues that the fact that he was not free to walk away transformed the stop into an arrest. The question of whether a person reasonably believes he is free to leave has relevance in determining whether a seizure has occurred, as opposed to a voluntary stop. Where, as here, it is acknowledged that a seizure of the person took place, it has relevance only if the limits of the *Terry* stop were exceeded and thereafter he was not free to leave.

Neither the length of the detention, which was at most 90 seconds until Smith fled, nor the nature of the questions, which were reasonably related to the reason for the stop, converted the stop into an arrest. *United States v. Bautista,* 684 F.2d 1286, 1290–91 (9th Cir.1982). Telling Smith to drop the metal pipe and briefly frisking his outer waist area were reasonable protective measures consistent with a *Terry* stop. *See Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. We agree with the district court that the initial stop of Smith was a justified *Terry* stop and not an arrest.

## IV

 Smith also contends that the officers had no authority to make the *Terry* stop off federal property. The Government argues that such authority existed under 16 U.S.C. § 1a–6(a)(3). That section authorizes the park police to:

> conduct investigations of offenses against the United States committed in [the park] system in the absence of investigation thereof by any other Federal law enforcement agency having investigative jurisdiction over the offense committed or with the concurrence of such other agency.

16 U.S.C. § 1a–6(a)(3).

Under section 1a–6(a)(3), the park police are authorized to investigate offenses committed within the park system. The geographic scope of their investigative authority, however, is not restricted to federal property. *See* H.Rep. No. 94–1569, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S. Code Cong. & Ad.News 4290, 4304.

Smith argues that the park police had no authority under section 1a–6(a)(3) to investigate in this case because no other federal law enforcement agency declined to act or gave the park police permission to investigate. Smith misreads the statute. Section 1a–6(a)(3) permits investigation of crimes committed in the park system "in the absence of investigation [by] or with the concurrence of" other federal law enforcement agencies. In this case, there was no other investigation by a federal law enforcement agency. That is all that is required by the statute.

Smith also argues that the authority of the park police under section 1a–6(a)(3) to investigate does not include the authority to make *Terry* stops. He reasons that the authority to make *Terry* stops derives from the power to arrest, and since section 1a–6(a)(3) does not confer the power to arrest, it also cannot confer the power to make a *Terry* stop.

We disagree with this argument. *Terry* stops are a commonly used investigative tool of law enforcement officers. A *Terry* stop is often necessary if an officer is to investigate criminal activity effectively and safely. *See Terry,* 392 U.S. at 22–24, 88 S.Ct. at 1880–1881. There is no reason to believe that Congress intended the park police officers' authority to investigate be construed so narrowly as to exclude *Terry* stops.

The initial stop of Smith was within the officers' authority under section 1a–6(a)(3).

## V

The initial stop of Smith was a *Terry* stop and not an arrest. The officers had authority to make the *Terry* stop under 16 U.S.C. § 1a–6(a)(3). The judgment is therefore affirmed.

AFFIRMED.